IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs November 12, 2015


**STATE OF TENNESSEE v. STACEY GREEN**


**Appeal from the Circuit Court for Marion County**
**No. 9625A    Thomas W. Graham, Judge**

_____


**No. M2015-00323-CCA-R3-CD – Filed February 1, 2016**

_____


The Defendant, Stacey Green, appeals from his convictions for aggravated robbery, burglary, aggravated assault, and three counts of facilitation of aggravated robbery. The Defendant contends that the trial court erred in denying his motion to suppress evidence relating to a victim's pretrial identification of the Defendant in a photographic lineup and that the evidence presented at trial was insufficient to support his convictions. Following a thorough review of the record and applicable law, we affirm the judgments of the trial court. However, we remand the matter to the trial court for the entry of a corrected judgment in Count 2.


**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the Court, in which NORMA MCGEE OGLE and CAMILLE R. MCMULLEN, JJ., joined.

Jay Underwood, Chattanooga, Tennessee, for the appellant, Stacey Green.

Herbert H. Slatery III, Attorney General and Reporter; Andrew C. Coulam, Assistant Attorney General; Neal Pinkston, District Attorney General; and David O. McGovern, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## I.  Factual and Procedural Background

This appeal involves an armed robbery that took place at a garage in Haletown in August 2013.  In October 2013, the Marion County Grand Jury indicted the Defendant[1] for the following offenses in connection with the robbery:[2]

| Count | Offense | Victim |
|---|---|---|
| 1 | Aggravated Robbery | Paul Turner |
| 2 | Aggravated Robbery | Terry Ballard |
| 3 | Aggravated Robbery | Christopher Haston |
| 4 | Aggravated Robbery | James Tucker |
| 5 | Aggravated Robbery | Christopher Timberlake |
| 6 | Felon in Possession of a Weapon | N/A |
| 7 | Felon in Possession of a Weapon | N/A |
| 9 | Burglary | Big Daddy's Fireworks |
| 10 | Aggravated Assault | Terry Ballard |

Prior to trial, the Defendant filed a Motion to Suppress Identification, requesting that the trial court suppress victim Christopher Timberlake's pretrial identification of the Defendant in a photographic lineup.  The trial court denied the Defendant's motion to suppress after a hearing.  The Defendant then filed a Motion to Sever Offenses, asking that the trial court sever Count 6 and Count 7 of the indictment.  The trial court granted the Defendant's motion and severed Counts 6 and 7 from the remaining counts.

Following a trial in July 2014, a jury found the Defendant guilty as follows:[3]

| Count | Offense | Victim |
|---|---|---|
| 1 | Facilitation of Aggravated Robbery | Paul Turner |
| 2 | Aggravated Robbery | Terry Ballard |
| 4 | Facilitation of Aggravated Robbery | James Tucker |
| 5 | Facilitation of Aggravated Robbery | Christopher Timberlake |
| 9 | Burglary | Big Daddy's Fireworks |

---

[1] The Defendant was indicted along with a co-defendant, Ronald Gary.

[2] The indictment found in the record does not include a Count 8.

[3] At the close of the State's case-in-chief, the trial court granted the Defendant's motion for judgment of acquittal as to Count 3, which concerned the aggravated robbery of victim Christopher Haston.

For these offenses, the trial court sentenced the Defendant, as a Range II multiple offender, to a total effective sentence of fourteen years and six months in the Department of Correction. Thereafter, the Defendant filed a timely Motion for New Trial, which the trial court denied. This timely appeal followed.

*Motion to Suppress Hearing*

At a hearing on the Defendant's Motion to Suppress Identification, Detective Matt Blansett of the Marion County Sheriff's Department testified that on August 15, 2013, he investigated an aggravated robbery at Big Daddy's Fireworks in Haletown. Detective Blansett explained that, when he arrived at the location, victims Terry Ballard and Christopher Timberlake were adamant that they knew some of the suspects that had robbed them. Detective Blansett recalled that Mr. Timberlake and Mr. Ballard kept saying that "Little Stacey from South Pittsburg" was one of the assailants. At the time of the offense, Detective Blansett was familiar with the Defendant and his nickname "Little Stacey"; however, Detective Blansett believed that the Defendant's last name was Bynum because the Defendant's mother's name was Flora Bynum. The detective asked Mr. Ballard and Mr. Timberlake if they meant Stacey Bynum, and Mr. Ballard agreed that it had been Stacey Bynum who stuck a gun to his head.

Detective Blansett explained that, as part of his investigation, he prepared a photo lineup for some of the victims to view possible suspects. On September 25, 2013, Detective Blansett conducted a photo lineup with Mr. Timberlake. Detective Blansett described the lineup as consisting of six color photographs, which were obtained from the jail booking system. All six photos were of African-American men with ear-length to shoulder-length hair. Detective Blansett testified that, although the victims had already named the Defendant as one of the suspects, he prepared the photo lineup to ensure that the victims knew the Defendant. Detective Blansett told Mr. Timberlake that he was going to show Mr. Timberlake a series of photos and that, if he noticed anyone that was involved in the robbery, to initial and date the suspect's photo. When shown the lineup, Mr. Timberlake initialed the Defendant's photo and dated it.

On cross-examination, Detective Blansett was shown Mr. Timberlake's handwritten statement from the night of the robbery. Detective Blansett agreed that Mr. Timberlake's handwritten statement did not mention the Defendant. Detective Blansett explained that he, Mr. Ballard, and Mr. Timberlake were standing in front of the building where the incident took place, and Mr. Ballard stated that it was "Little Stacey." Mr. Timberlake agreed with Mr. Ballard saying, "That's who it was. That's who it was." Detective Blansett stated that Mr. Ballard was "more adamant" because the Defendant

was Mr. Ballard's cousin and Mr. Ballard "couldn't believe [the Defendant would] rob his cousin." Additionally, Detective Blansett stated that Mr. Timberlake was "shook up that night" and did not give a detailed written statement. Detective Blansett testified that, after leaving the crime scene, he went to the police department in Stevenson, Alabama in an attempt to locate additional suspects, Nick Price and "Little Ron." Although Mr. Timberlake and Mr. Ballard were at the Stevenson Police Department when he arrived, Detective Blansett did not talk with them.

According to Detective Blansett, he conducted the photo lineup with Mr. Timberlake and Mr. Ballard at the sheriff's department on September 25, 2013. After viewing the photo lineup and identifying the Defendant, Mr. Timberlake wrote out a second statement. Detective Blansett did not recall if he discussed with Mr. Timberlake whether the Defendant had already turned himself in. However, Detective Blansett testified that he did not discuss anything with Mr. Timberlake before showing him the lineup. When he was shown the lineup, Mr. Timberlake said, "That's Little Stacey" and identified the Defendant.

Following Detective Blansett's testimony, the Defendant introduced a portion of Mr. Timberlake's testimony from the Defendant's preliminary hearing. While the recording played, the court reporter transcribed Mr. Timberlake's preliminary hearing testimony as follows:[4]

> Q: Well, when they got there, you didn't say that Stacey Green was one of the people that robbed you, did you?
>
> A: No.
>
> Q: You didn't say that?
>
> A: No.
>
> Q: You told Mr. Gary about this. You didn't say anything about Stacey Green. At some point y'all were talking to each other and someone suggested it was Stacey Green; right?
>
> A: No. He was talking about—we was [sic] talking and he said Stacey knowed [sic] him.

---

[4] It is unclear from the transcript whether the State or the Defendant was questioning Mr. Timberlake during this portion of the preliminary hearing.

- 4 -

Q: Say it again, now.

A: (Inaudible) said Stacey knowed [sic] him.

Q: But you didn't say anything about Stacey?

A: (Inaudible.)

Q: So, Gary . . . What's Gary's last name? (Inaudible) What was his name? Terry?

A: Yeah.

Q: So Terry said he thought it was Stacey, but you never said anything about Stacey?

A: I didn't give Stacey's name that night, no.

Q: Well, you didn't tell the detective who the guy was that did that?

A: Uh?

Q: You didn't tell the investigators that you know anybody else other than this gentleman here; right?

A: I wrote down the person, that's what I wrote down, the first night, yes.

Q: So you wrote down a statement and said nothing about Stacey Green—

At the conclusion of the hearing, the trial court found that there was "nothing suggestive about the lineup itself. The folks in the photo are very similar in characteristics to the defendants. Nothing is really suggestive." The trial court stated that it did not find "any reason" to suppress Mr. Timberlake's identification of the Defendant and denied the Defendant's motion in a written order.

*Trial*

At trial, James Tucker testified that on August 15, 2013, he and several friends were playing cards at a garage owned by Big Daddy's Fireworks. Mr. Tucker explained

that he had played cards at this location for years. Mr. Tucker arrived at the garage that Thursday night around 7:00 p.m. or 7:30 p.m. He and four other men—Terry Ballard, Paul Turner, Chris Timberlake and another man known to Mr. Tucker by the nickname "Flake"—sat around an oval poker table that was set up inside the garage in front of the open garage door. Mr. Tucker recalled that he was seated at the far end of the table, facing directly towards the garage door, with Mr. Timberlake to his right and Mr. Ballard to his left. Around 10:00 p.m., the group was discussing ending the poker game because they did not have enough players when Mr. Tucker noticed several men coming through the gate to the chain link fence surrounding the garage. After the men got through the chain link fence, they ran into the garage and began "hollering and yelling" for everyone to "[g]et down, get on the floor." Mr. Tucker recalled that "[n]obody really reacted right at first, because we just thought it was a joke." He stated that it was not unusual for someone to join the poker game at 10:00 p.m., after getting off work. However, Mr. Tucker noticed that the men who entered the garage had guns. He saw one man standing behind Mr. Timberlake, holding a .38 semi-automatic pistol, and a man behind Mr. Ballard with a revolver. Mr. Tucker testified that there was also a man behind him who was poking him in the back of the head with a gun, but Mr. Tucker could not see this man. Mr. Tucker testified that, when it became evident that the men were not joking, he got down on the ground. Mr. Timberlake, however, refused the assailants' orders, saying, "I'm not getting on the ground. Take what you want, but I'm not laying [sic] down on the floor . . . ." Mr. Tucker testified that, as Mr. Timberlake refused to do as instructed, Mr. Tucker watched the man behind Mr. Timberlake, looking at the man "eye to eye . . . right in his face[.]" When the man standing behind Mr. Tucker saw this, he put a gun to the back of Mr. Tucker's head and ordered Mr. Tucker to, "Quit watching him." The man removed about $120 from Mr. Tucker's wallet and then threw the wallet on the garage floor.

Regarding the identity of the assailants, Mr. Tucker testified that, although the men had shirts pulled up around their faces and tied in back, he could see their eyes and noses. Additionally, some of the men's shirts "kept falling down," and the men would have to pull them back into place. Mr. Tucker testified that he got a "good look" at the man holding a gun on Mr. Timberlake, and he identified the man as Ron Gary, or "Little Ron." Mr. Tucker stated that he had played cards with Mr. Gary, before and he recognized Mr. Gary's face and voice. Mr. Tucker also saw the man standing behind Mr. Ballard, but Mr. Tucker "didn't get a good look at his face." Accordingly, Mr. Tucker could not identify the man behind Mr. Ballard. However, Mr. Tucker estimated that the man was a little over six feet tall and had dreadlocks. According to Mr. Tucker, the robbery lasted five to seven minutes. Once the assailants left the garage, Mr. Tucker and the other victims waited about thirty seconds and ran outside. They did not see anyone and did not see any vehicles driving away.

On cross-examination, Mr. Tucker stated that the weekly poker games had been going on for about five or six years and that the week before the robbery the group had decided to move the game to Thursday nights. Mr. Tucker recalled that Mr. Gary, whom he had known for about a year and a half, was in attendance at the poker game when it was announced that the game would move to Thursday night. Mr. Tucker testified that he had known the Defendant for about fifteen years, but he had not seen the Defendant for two or three years. He recalled that, on the night of the robbery, he and the other victims had bought poker chips to play in the game. The players' money was kept in a cash box on the poker table, and the assailants took the money out of the cash box. Mr. Tucker stated that two people from the group called 911 after the robbery. In an attempt to locate the suspects, Mr. Ballard and Mr. Timberlake drove off in Mr. Timberlake's car. Mr. Ballard and Mr. Timberlake returned to the garage about five minutes later and said that they had seen the suspects getting off the interstate "on the other side" and had decided to return to the garage.

Paul Turner testified that he was the manager of Big Daddy's Fireworks which was owned by L.W. Lloyd. Mr. Turner explained that Mr. Lloyd also owned the building where the poker game was played on August 15, 2013. As Mr. Lloyd's representative, Mr. Turner testified that the men who entered the garage and robbed the victims did not have the owner's permission to do so. Mr. Turner recalled that he began playing cards around 7:00 p.m. that night and that there were five men in total playing at the time of the robbery. The garage was open, and the group was seated around an oval table just inside the door. Mr. Turner testified that, as they played cards, he saw a couple of men come through the gate of the chain link fence. Initially, he did not pay much attention to the men but then, "all of a sudden," Mr. Turner heard the men running and yelling. At least four assailants entered the garage holding guns. Mr. Turner recalled that one of the men turned his chair over and put a gun in Mr. Turner's face. Mr. Turner stated that he "didn't see nothing [sic] but the gun." The man took $500 of the poker money plus an additional $100 to $150 from Mr. Turner. Mr. Turner estimated that the event lasted two to three minutes. After the assailants left the garage, Mr. Turner called 911. Mr. Turner did not see the direction the suspects went, but someone told him that the men were headed towards Alabama. In turn, Mr. Turner reported this information to the 911 dispatcher. Mr. Turner testified that he also went across the street to ask some people standing by a car if they had seen anything but they had not. Mr. Turner did not see Mr. Timberlake or Mr. Ballard leave the scene after the robbery. He testified that the game was a private poker game and that, to his knowledge, the Defendant had never played in the game.

Christopher Timberlake testified that he was also at the poker game on August 15, 2013, when the robbery occurred. Mr. Timberlake stated that he knew the Defendant prior to that night and that he had never had any problems with the Defendant.

Regarding the robbery, Mr. Timberlake testified, "We [were] playing and got this big bay door open, and five people come running in with guns pointed." According to Mr. Timberlake, the men had shirts wrapped around their faces, which were covering their mouths and necks. The men told everyone to "get down," but Mr. Timberlake refused to get out of his chair. Mr. Timberlake recalled that one of the assailants held a gun on Mr. Ballard and told Mr. Ballard to get onto the floor. Mr. Timberlake recognized the man as the Defendant. The Defendant then "popped" Mr. Ballard on the back of the head and searched Mr. Ballard's pockets. Mr. Timberlake testified that, during this time, he heard the Defendant and Mr. Ballard talking. Mr. Ballard told the Defendant, "Cuz, you know me." Mr. Timberlake stated that he was sure of his identification of the Defendant, whose nickname was "Little Stacey." Mr. Timberlake identified Mr. Gary as the man who pointed a gun at him during the robbery. According to Mr. Timberlake, Mr. Gary put a gun to Mr. Timberlake's head, went into his pockets, and took his money. He recalled that the Defendant had a revolver and Mr. Gary had a semi-automatic pistol. Mr. Timberlake estimated that the robbery took less than ten minutes. He acknowledged that, at one point, he had mistakenly thought a man named Nick Price was involved in the robbery.

After the suspects left the garage, Mr. Timberlake and Flake got into Mr. Timberlake's car to look for the robbers. Mr. Timberlake was angry and upset, and Flake was "in shock." Mr. Timberlake drove down the interstate for a while, but then Flake said to turn around. They returned to the garage to check on the other victims and to speak with law enforcement officers. Mr. Timberlake was later shown two photographic lineups by Detective Blansett. From these lineups, Mr. Timberlake identified the Defendant as the person who had robbed Mr. Ballard and Mr. Gary as the man who robbed him. Mr. Timberlake explained that he knew who the assailants were before looking at the lineups.

On cross-examination, Mr. Timberlake stated that he had been playing in the poker game at the garage for about three years and that he introduced Mr. Gary to the game about two years before the robbery. Mr. Timberlake explained that, during the robbery, the person he initially identified as Mr. Price ran towards Mr. Turner, grabbed him, and put him onto the floor. Mr. Timberlake stated that he "caught a glimpse" of Mr. Gary as Mr. Gary came into the garage and that Mr. Gary's mask partially fell down as Mr. Gary ordered the victims to the ground. Mr. Timberlake then saw the Defendant standing across the table behind Mr. Ballard. Mr. Timberlake knew the Defendant because he had worked with the Defendant's mother and the Defendant visited her at work. Mr. Timberlake acknowledged that he signed a written statement the night of the robbery which read, "Lil Ron Gary held a gun to my head and took everything that I had." When asked why he did not mention the Defendant in this statement, Mr. Timberlake explained that he "wasn't worried about Little Stacey" because the Defendant

did not put a gun to his head. Mr. Timberlake further explained that he "was in a state of shock a little bit."

Mr. Timberlake recalled that, after the robbery, he waited about two minutes and then ran to his car with the intent to hunt down the assailants. Mr. Timberlake explained that he was furious but did not have a plan. He was gone for a few minutes and then returned to the garage. He told Mr. Turner that he thought the suspects were heading to Alabama. After speaking to police, Mr. Timberlake and Mr. Ballard went to Stevenson, Alabama,[5] looking for Mr. Price's house, but Stevenson police officers stopped them. Mr. Timberlake stated that, during the robbery, the Defendant had a blue shirt wrapped around his face, but he could see the Defendant from the nose up. However, Mr. Timberlake agreed that he did not have on his glasses that night and that it had been years since he had seen the Defendant. Mr. Timberlake testified that, although the assailants stole his wallet, Mr. Turner later found his driver's license on the side of the road.

Terry Ballard testified that he was at the poker game on the night of the robbery. Mr. Ballard recalled that he was playing poker with his friends when about five men rushed through the door. The men told them to "get down, get down" and then robbed them. Mr. Ballard identified the Defendant as the man that robbed him at gunpoint. He explained that, although the Defendant had something covering his face, the cloth fell and he saw the Defendant's "whole face" and heard the Defendant's voice. Mr. Ballard testified that, during the robbery, he had a conversation with the Defendant and told the Defendant, "I'm your cousin, I know you're not going to kill me." Mr. Ballard testified that the Defendant was his cousin. He stated that he had no reason to want to get the Defendant into trouble and that, before the night of the robbery, he had always gotten along with the Defendant and the Defendant's family.

On cross-examination, Mr. Ballard explained that, after the suspects left, he ran out of the garage, hid near some junk cars, and called 911. He acknowledged that he mentioned Mr. Gary and Mr. Price to the police dispatcher but he did not mention the Defendant's name during the 911 call. Mr. Ballard explained, "I was scared." He stated that the Defendant hit him in the back of the head with a gun, pushed his head down, and then rummaged through his pockets. Mr. Ballard stated that he did not see a getaway car but recalled that someone thought they saw Mr. Price's car. After speaking to police, Mr. Ballard and Mr. Timberlake went to Stevenson, Alabama to look for Mr. Price.

Mr. Ballard explained that the Defendant took his keys and wallet during the robbery. Following the robbery, Mr. Ballard called another cousin, Rashad Tipton, and

---

[5] It appears from the testimony that Mr. Price, Mr. Gary, and Mr. Ballard were from Stevenson, Alabama.

asked if Mr. Tipton knew anything about the incident. Mr. Ballard told Mr. Tipton that he needed his keys to get into his house, and Mr. Tipton said that he would see if he could find out anything about the robbery. Mr. Ballard testified that he later found his keys based on a tip from Mr. Tipton.

Detective Matt Blansett of the Marion County Sheriff's Department testified that, on August 15, 2013, he responded to the storage garage after being advised that there had been an armed robbery at the location. When he arrived, Detective Blansett took over the investigation. Detective Blansett collected no physical evidence at the scene tying the Defendant to the robbery. He obtained surveillance footage from Glenn's Wrecker Service, but the quality of the video was "very poor." However, Detective Blansett spoke to Mr. Ballard and Mr. Timberlake, and they gave him the names of several of the suspects. Based upon this information, Detective Blansett attempted to locate Mr. Price, Mr. Gary, and the Defendant. He went to Stevenson, Alabama and located Mr. Price that night, but he could not locate the Defendant or Mr. Gary. According to Detective Blansett, Mr. Price was fully cooperative with the investigation, and he determined that Mr. Price was not involved. The Defendant eventually turned himself into police after learning that there were warrants for his arrest. In an interview with Detective Blansett, the Defendant claimed that he had been to Rudder's Market on the night of the robbery, where he bought chicken and pizza. However, Detective Blansett testified that, when he looked at the surveillance video from the market and store receipts, he determined that the Defendant had not been at the store when the Defendant claimed.

Detective Blansett stated that, several weeks after the robbery, he showed Mr. Timberlake photo lineups containing Mr. Gary and the Defendant. He recalled that Mr. Timberlake had no hesitation when he identified the Defendant in the photo lineup. Detective Blansett explained, "When I handed [Mr. Timberlake] the lineup I advised him to look at the lineup and if he recognized anyone in the lineup to initial and date it, and he said, 'That's him. That's Little Stacey.'"

## II. Analysis

### *Motion to Suppress Identification*

On appeal, the Defendant contends that the trial court erred in denying his Motion to Suppress Identification. He argues that Detective Blansett must have mentioned the Defendant's name to Mr. Timberlake before the photographic lineup[6] was shown and,

---

[6] We note that the record does not contain the original photo lineup used by Detective Blansett. The record contains photocopies of the lineup which are in black and white and illegible/distorted. However, we have concluded it is unnecessary to have the original copy of the lineup to resolve the issue

- 10 -

therefore, the lineup was unnecessarily suggestive, violates due process, and should have been suppressed by the trial court. The State responds that the Defendant has not presented any proof, beyond mere speculation, that Detective Blansett suggested to Mr. Timberlake that the Defendant committed these offenses and, as a result, the trial court did not err in refusing to suppress the pretrial identification by Mr. Timberlake. We agree with the State.

When reviewing a motion to suppress, this court is bound by the trial court's findings of fact unless the evidence preponderates otherwise. State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). Questions of credibility, the weight and value of the evidence, and resolutions of conflicts in the evidence are resolved by the trial court. Id. The prevailing party is entitled to the strongest legitimate view of the evidence and all reasonable inferences that may be drawn therefrom. Id. We review the trial court's conclusions of law de novo. State v. Carter, 160 S.W.3d 526, 531 (Tenn. 2005). In evaluating the correctness of a trial court's ruling on a pretrial motion to suppress, this court may consider the proof adduced both at the suppression hearing and at trial. State v. Henning, 975 S.W.2d 290, 299 (Tenn. 1998).

"Convictions based on eyewitness identification at trial following a pre-trial photographic identification will be set aside only if the photographic identification was 'so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.'" State v. Robinson, 146 S.W.3d 469, 516 (Tenn. 2004) (quoting Simmons v. United States, 390 U.S. 377, 384 (1968)). Although the pretrial photographic identification may be suggestive, the identification may satisfy due process as reliable and admissible when considering the totality of the circumstances. Id. (citing State v. Brown, 795 S.W.2d 689, 694 (Tenn. Crim. App. 1990)). This court considers the following five factors in determining whether a suggestive pretrial photographic identification satisfies due process: (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the time between the crime and the confrontation. Id. at 517 (citing Neil v. Biggers, 409 U.S. 188, 199 (1972) and State v. Strickland, 885 S.W.2d 85, 88 (Tenn. Crim. App. 1993)).

Upon review, we conclude that the trial court did not err in denying the Defendant's Motion to Suppress Identification because there was nothing suggestive

---

presented. At the hearing on the motion to suppress, Defense counsel said that "this is not a typical suggestive lineup factual situation," and that he was not making the argument that the photos used in the lineup were "so dissimilar to [the Defendant][.]"

about the photographic lineup or the way in which it was conducted. Detective Blansett testified that, when he arrived at the crime scene on the night of the offenses, both Mr. Timberlake and Mr. Ballard agreed that "Little Stacey" was one of the assailants. During his subsequent investigation, Detective Blansett prepared a photographic lineup which consisted of six color photographs that he obtained from the jail booking system. All six photos were of African-American men with ear-length to shoulder-length hair. In conducting the lineup, Detective Blansett advised Mr. Timberlake that he was going to show Mr. Timberlake a series of photos and that, if Mr. Timberlake noticed anyone that was involved in the robbery, Mr. Timberlake should initial and date the suspect's photo. When shown the lineup, Mr. Timberlake initialed and dated the Defendant's photo and said, "That's Little Stacey." Despite the Defendant's claim to the contrary, Detective Blansett testified that he did not discuss anything with Mr. Timberlake before showing him the lineup. There is simply no testimony of any sort demonstrating that Detective Blansett suggested to Mr. Timberlake that the Defendant was involved in the robberies. Because the photographic identification was not "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification," the trial court properly denied the Defendant's Motion to Suppress Identification, and the Defendant is not entitled to relief.

### *Sufficiency of the Evidence*

The Defendant contends that the State did not sufficiently establish that he was one of the perpetrators of the offenses. He argues that both Mr. Timberlake and Mr. Ballard were not credible in their identification testimony and that the State failed to present any physical evidence tying him to the robbery. He does not challenge the sufficiency of the evidence with regard to any of the other elements of the offenses for which he was convicted. The State responds that this issue is without merit because it sufficiently proved that the Defendant committed the crimes for which he was convicted. Again, we agree with the State.

The applicable standard of review for a sufficiency of the evidence challenge is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979) (emphasis in original); see also Tenn. R. App. P. 13(e). A guilty verdict "removes the presumption of innocence and replaces it with a presumption of guilt, and the Appellant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997); State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). Our standard of review "is the same whether the conviction is based upon direct or circumstantial evidence." State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)) (internal quotation marks omitted).

In a jury trial, the weight and credibility given to the testimony of witnesses, as well as the reconciliation of conflicts in that testimony, are questions of fact best determined by the jury, since they saw and heard the witnesses, and by the trial judge, who concurred in and approved the verdict. Bland, 958 S.W.2d at 659. This court will not reweigh the evidence. Id. On review, the "State must be afforded the strongest legitimate view of the evidence and all reasonable inferences that may be drawn therefrom." State v. Vasques, 221 S.W.3d 514, 521 (Tenn. 2007).

The identity of the perpetrator is "an essential element of any crime." State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006). Identity may be established with circumstantial evidence alone, and the "jury decides the weight to be given to circumstantial evidence, and [t]he inferences to be drawn from such evidence . . . ." Id. (internal quotation marks omitted). The question of identity is a question of fact left to the trier of fact to resolve. State v. Crawford, 635 S.W.2d 704, 705 (Tenn. Crim. App. 1982).

Although the Defendant is correct that the State lacked physical evidence tying the Defendant to the crime scene, the State presented the testimony of Mr. Ballard, who positively identified the Defendant as the person who put a gun to his head and took his money. Mr. Ballard testified that the Defendant was his cousin and that he was familiar with the Defendant's appearance and voice. Moreover, Mr. Ballard stated that he heard the Defendant's voice and saw the Defendant's "whole face" when the cloth covering the Defendant's face fell down during the robbery. Mr. Ballard explained how he recognized the Defendant and told the Defendant, "I'm your cousin, I know you're not going to kill me."

Mr. Timberlake also testified that he was familiar with the Defendant, and he saw the Defendant standing across the table behind Mr. Ballard during the robbery. He explained that, although the Defendant had a blue shirt wrapped around his face, he could see the Defendant from the nose up. Following the robbery, Mr. Timberlake picked the Defendant out of a photo lineup, and he testified that he was sure of his identification of the Defendant. Moreover, Mr. Timberlake's failure to include the Defendant's name in his first written statement to police was explained at trial. Detective Blansett testified that Mr. Timberlake was "shook up that night" and did not give a detailed written statement. Mr. Timberlake also stated that he "was in a state of shock" following the robbery. Viewing this testimony in the light most favorable to the State, we conclude that the State sufficiently proved the Defendant's identity, and the Defendant is not entitled to relief.

### III.  Conclusion

For the aforementioned reasons, the judgments of the trial court are affirmed. However, we note that the judgment of conviction for Count 2 fails to list the conviction offense and corresponding Tennessee Code Annotated section for the Defendant's conviction of aggravated assault.  We, therefore, remand this matter to the trial court for the entry of a corrected judgment.


_____
ROBERT L. HOLLOWAY, JR., JUDGE